

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-18-00462-CR

———————————————————

DONTRELL LAMOND DOCK, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from Criminal District Court No. 2
Tarrant County, Texas
Trial Court No. 1484820D

---

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

A jury convicted Dontrell Lamond Dock of murder, a lesser-included offense of the charged offense (capital murder), and assessed his punishment at life in the penitentiary. After sentencing, Dock appealed.

Attacking the trial court's order denying his motion to suppress, Dock raises five issues, which we quote:

1.  Whether Dock's confession to participating in the robbery should have been suppressed because the police deliberately circumvented *Miranda*.[1]

2.  Whether Dock's confession should have been suppressed because Dock's ostensibly non-custodial interrogation was in fact custodial, thus demanding the warnings required by *Miranda* and Article 38.22 of the Texas Code of Criminal Procedure.

3.  Whether Dock's confession should have been suppressed because Dock was persuaded to confess, thereby making the confession involuntary under Article 38.21 of the Texas Code of Criminal Procedure.

4.  Whether Dock's text messages and internet searches should have been suppressed because Dock's consent to search his iPhone was involuntary.

5.  Finally, even if, individually, the admissions of Dock's confession, text messages, and internet searches were not harmful, the admissions were cumulatively harmful, meriting the reversal of his conviction. Indeed, Dock's confession, text messages, and internet searches were the entirety of the State's case.

We affirm.

---

[1]*Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 1630 (1966).

## Background

Chris Russell sold marijuana out of a Fort Worth apartment. One night while Russell was sleeping, gunmen broke into his apartment, demanded money and drugs, and shot and killed him. Although many people were in the apartment, none could pinpoint the assailants.

Identifying Russell's gunmen—and ultimately Dock—took the path of falling dominoes.

Through the apartment complex's security footage, Detective John Galloway and a second detective referred to only as Detective Green were able to identify the suspects' car's license plate, from which they learned that Terri Ross and Brodrick Ross Sr. were the owners. Perhaps more important, by running the license plate through another system, the detectives pinned down the car's location to an apartment complex in Denton.

The Denton apartment complex's manager told the detectives that the car was registered there as belonging to a guest of complex tenant Dalisha Brooks. Brooks told the detectives that the car belonged to Darius Ross.

After speaking to Darius, the detectives learned that his brother, B.J., had borrowed Darius's car to pick up "some people in Conroe" and drive them to Fort Worth, where they had planned to commit a robbery. Darius did not mention Dock to Detective Galloway.

But after Detective Galloway left the interrogation room, Darius's mother entered; the interrogation-room camera, which was still running, recorded their conversation. Darius mentioned the name "Dock."

The next domino was B.J., who informed Detective Galloway that "Dontrell Dock" participated in the robbery. Detective Galloway now had a full name, and Dock was now a suspect. Even so, Detective Galloway opined that he still lacked probable cause to arrest Dock.

Wanting to speak with him in person, Detective Galloway telephoned and asked if Dock would travel from Conroe to Fort Worth for an interview. Detective Galloway assured Dock that if he came to Fort Worth, "he'd be leaving the way he came." Dock agreed. Only 19 at the time, on January 17, 2017, Dock and his mother made the three-and-a-quarter-hour drive from Conroe to Fort Worth.

At the Fort Worth police station, while Dock's mother waited outside the interrogation room, Detective Galloway told Dock that he was not under arrest, that he was free to leave, and that the door to the room was not locked. Asserting that he was there to clear his name, Dock then embarked on a lengthy chat with Detectives Galloway and Green.[2] Four hours later, after Dock had admitted to participating in

---

[2]Although "chat" aptly describes the tenor of the detectives' interactions with Dock, we will refer to the process as an "interrogation" because Detective Galloway acknowledged that Dock was a suspect and because the detectives' purpose was to gather information. *See Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 1689–90 (1980) ("[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than

the armed robbery that resulted in Russell's death and after Dock had consented to letting the police search his cell phone, Dock left the police station.[3] Dock never asked to stop the interrogation, never asked for an attorney, and never asked to leave. Then again, at no point during the roughly three-hour interrogation[4] did Detective Galloway inform Dock that he had the right to remain silent, that anything he said could be used against him in a court of law, that he had the right to the presence of an attorney, or that if he could not afford an attorney, one would be appointed to him before any questioning if that was what Dock wanted. In short, Dock never received any *Miranda* warnings.

---

those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (citation omitted)).

After the interrogation, when Dock was first alone with his mother (but while the interrogation-room camera was still running), he expressed his satisfaction with how the interrogation had gone and assured her that he knew that both he and B.J. (whom Dock had not identified as the shooter) were going to be okay "for a fact."

[3]Dock identified the shooter to the detectives. Dock also described the shooting as unnecessary and unprovoked.

But the next day, Dock discovered a gun in his backpack and his mother notified Detective Galloway, who then drove to Conroe, where a Conroe crime-scene police officer took custody of it. A firearm and tool-mark examiner later identified the gun as the murder weapon. Although law enforcement arrested the person whom Dock identified as the shooter, a grand jury no-billed him.

[4]The interrogation itself lasted about three hours, but Dock and his mother remained in the interrogation room for the next hour or so while the police consensually obtained Dock's cell phone's contents. The State's video exhibit runs slightly over four hours altogether.

After the interrogation, Dock and his mother went home to Conroe.

Detective Galloway acknowledged never having read Dock his *Miranda* rights or his rights under Article 38.22 of the Texas Code of Criminal Procedure. When asked why he had not, Detective Galloway responded, "It was a noncustodial interview, and since he wasn't in custody[,] he was free to leave and gonna be able to leave on his own accord whenever he wanted." Detective Galloway conceded that for noncustodial interrogations, nothing stopped him from giving the *Miranda* warnings, but he chose not to, agreeing that for noncustodial interrogations, he did not give *Miranda* warnings. This appeared to trouble the trial court:

> THE COURT: Wouldn't it be just as easy, he's in there, he doesn't have a lawyer, he seemed like he was volunteering information to you, wouldn't it have been easier just to Mirandize him anyway, just in case?
>
> THE WITNESS: When you say that, yes, sir, I guess I could have done that, yes, sir. I chose not to, yes, sir, you're right.
>
> THE COURT: I mean, do y'all do that all the time with everybody else?
>
> THE WITNESS: On noncustodial interviews, yes, sir.

Pressing further, the trial court then asked Detective Galloway if he was using this procedure to circumvent the *Miranda* warnings:

> THE COURT: You thought he was a suspect. It's simple to just Mirandize the guy, whether he's in custody or he's not in custody, especially if you think he's a suspect. I mean, you've gotten other information that he quite possibly would be a suspect, and you could put your hands on him anyway.
>
> I think what I'm trying to find out is is that your procedure that even if he's a suspect, that you will invite them in, get the information,

6

allow them to leave, arrest them shortly after that, and then come into court and say, well, he wasn't in custody so I could ask him all these questions without Mirandizing him. Is that pretty much your procedure?

THE WITNESS: No, sir, it's not the procedure. After talking to him, we went ahead and got surveillance video, so I could see for myself, and worked on cellphone records, that kind of thing, so we could corroborate their story.

THE COURT: All right.

THE WITNESS: We tried to get more information, because at that point I had finger-pointing, basically, so I wanted to corroborate their statements with other evidence to be collected later.

THE COURT: Okay. All right. That's what I needed to know.

When ruling, the trial court summarized the facts and its analysis at length, concluding by stating that Dock was not in custody and that Dock's statement was voluntary:

> Now, custody occurs when a suspect is actually arrested, and it also can occur when a suspect is physically deprived of his freedom of action in any significant way, such as being placed in a police vehicle, taken to a police station for questioning, or where the suspect is led to believe, as any reasonable person would be, that he is deprived of his freedom of movement or where there is probable cause to arrest him and [the] police do not tell the suspect that he's free to leave. Detective Galloway did none of that. He actually told him he was free to leave. He actually told him that after you talk with me today, you're going home. And that's, in fact, what happened; after the interview, Mr. Dock and his mother left the station and they went back to Conroe.
>
> And the Court's going to make that finding[—]that an accused, even though he might be a suspect, is not in custody where the accused voluntarily accompanies police officers, who are then in the process of investigating a crime, and whether that be to a police station or to anyplace else, and that [the] police officer informs him that he, in fact, is not only not in custody but he's free to leave at any time.

7

Now, the better part of valor would be, yes, give him his [*Miranda*] warnings. That's what the Court was asking Officer Galloway about. But the Court also recognizes that police officers may use any type of techniques that they feel would be legal to get the information that they need concerning a crime that has occurred. And if the police officers are not threatening a person and not holding a person in confinement, [are] not telling [the person] that [he has] no right to leave, then they're free to use these techniques. I mean, it's done all the time.

So based upon all of this, the Court is going to make a finding that Mr. Dock did go into this interview voluntarily, that he was not compelled by Detective Galloway or any of the other officers to remain there under the threat that he could not leave or remove himself from the interview room, that he was not denied any facilities, restroom facilities, or was offered several times if he needed additional water or beverage, and that as such, the interview was done properly. It was not done under the force of an arrest, and it was, in fact, a voluntary statement, given that Mr. Dock was not under arrest and that he was, in fact, free to leave, and the he did, in fact, leave[,] and so it was not a custodial interrogation. That's going to be the Order of the Court.

**Standard of Review**

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007). We thus defer almost totally to the trial court's rulings on (1) questions of historical fact, even if the trial court determined

8

those facts on a basis other than evaluating credibility and demeanor, and (2) application-of-law-to-fact questions that turn on evaluating credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the witnesses' credibility and demeanor, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a suppression motion, we must view the evidence in the light most favorable to the ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those findings. *Kelly*, 204 S.W.3d at 818–19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 818. Even if the trial court gave the wrong reason for its ruling, we must uphold the ruling if it is both supported by the record and correct under any applicable legal theory. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003).

## Discussion

## I.  Dock was not in custody.

We address Dock's second issue first—that is, was he in fact in custody and thus entitled to the warnings required by *Miranda* and Article 38.22? *See Miranda*, 384 U.S. at 444–45, 86 S. Ct. at 1612; Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a)(2). *Miranda* addresses "the admissibility of statements obtained from an individual who is subjected to custodial police interrogation." *Miranda*, 384 U.S. at 439, 86 S. Ct. at 1609. "By custodial interrogation, [courts] mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444, 86 S. Ct. at 1612.[5] A custodial interrogation is also a prerequisite to the warnings required by Section 3(a)(2) of Article 38.22. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a)(2).

An officer's obligation to give the warnings is triggered only when a person is in custody. *Stansbury v. California*, 511 U.S. 318, 322, 114 S. Ct. 1526, 1528 (1994). And courts determine whether a person is in custody by examining all the circumstances surrounding the interrogation and resolving whether law enforcement formally

---

[5]*Miranda* discussed how the FBI and some foreign jurisdictions require warnings before law enforcement interrogates suspects. 384 U.S. at 483–90, 86 S. Ct. at 1632–36. *Miranda* itself did not go that far. Although Detective Galloway denied having probable cause to arrest Dock (which Dock disputes), Detective Galloway acknowledged that Dock was a suspect. But under *Miranda*, whether Detective Galloway had probable cause and whether Dock was a suspect are not the questions asked. Whether Dock was in custody is.

10

arrested the person or, alternatively, restrained the person's freedom of movement to the degree associated with a formal arrest. *Id.*, 114 S. Ct. at 1529.

## A. The detectives' interrogation techniques were indistinguishable from those used in custodial interrogations.

Dock focuses on the detectives' interrogation techniques, which were remarkably similar to those discussed in *Miranda* over half a century ago. *See id.* at 448–50, 86 S. Ct. at 1614–15.

In *Miranda*, by reviewing various police manuals, the Supreme Court learned that the primary psychological factor contributing to successfully interrogating someone was privacy—being alone with the person being interrogated. *Id.* at 448–49, 86 S. Ct. at 1614–15. Isolation cuts the person off from others who might otherwise provide moral support and simultaneously reinforces law enforcement's perceived invincibility. *Id.* at 449–50, 86 S. Ct. at 1615.

In Dock's case, although Dock's mother came with him, Detectives Galloway and Green interrogated him in a small interrogation room while Dock's mother waited elsewhere. They had successfully isolated Dock.

Continuing with its review of police manuals, the Supreme Court wrote that the manuals instructed interrogators to "display an air of confidence in the suspect's guilt and from outward appearance to maintain only an interest in confirming certain details." *Id.* at 450, 86 S. Ct. at 1615. The interrogator posits the subject's guilt as a given and directs his comments toward the reasons why the subject committed the act

11

"rather than court failure by asking the subject whether he did it." *Id.,* 86 S. Ct. at 1615. The manuals instruct officers to minimize the moral seriousness of the offense and to cast blame on the victim or on society. *Id.,* 86 S. Ct. at 1615. Interrogators dismiss and discourage contrary explanations and encourage a story that is "but an elaboration of what the police purport to know already." *Id.,* 86 S. Ct. at 1615.

Here, the detectives' interrogation followed this approach. After Dock's mother came into the interrogation room, Dock marveled at how much the police already knew even before he stepped foot in the room. When Dock's mother asked if the person killed was a drug dealer, Dock responded that he was and that the detectives had told him that the victim had a long criminal record. And later Dock related how the detectives knew that he was "innocent" (not the shooter) and that they just wanted to know why the shooter pulled the trigger. When Dock's mother expressed the hope that law enforcement would charge the shooter and let it be a lesson learned for everyone else, Dock responded by hoping that that would be the case, and substantiating that expectation, Dock noted that the detectives had made it clear to him that they already knew what had happened and had not treated him like a suspect.

Dock is not mistaken that his interrogation was very similar to those described in *Miranda.* But what is not similar is context: *Miranda* applies only to custodial interrogations. *Id.* at 478–79, 86 S. Ct. at 1630. Here, the trial court found that Dock was not in custody.

12

**B. The detectives and Dock engaged in one of three types of encounters.**

Interactions between law-enforcement officers and the public fall into one of three categories:

- consensual encounters,

- investigatory detentions, and

- arrests.

*State v. Woodard*, 341 S.W.3d 404, 410–11 (Tex. Crim. App. 2011).

**1. Consensual encounters involve no restraint.**

Consensual encounters do not implicate search-and-seizure protections. *Id.* at 411. Law enforcement is free to stop and question anyone; no justification is required. *Id.* And the public may, at will, end consensual encounters. *Id.* Even when the officer does not explicitly say that a person may ignore the officer's request, if the person acquiesces, then the encounter remains consensual. *Id.* Courts consider all the circumstances surrounding the interaction to determine whether a reasonable person in the defendant's shoes would have felt free to ignore the request or end the encounter. *Id.* If a reasonable person could ignore the request or end the interaction, then no seizure has occurred. *Id.* Courts take into account the surrounding circumstances, including time and place, but the officer's conduct is the most important factor in deciding whether an interaction was consensual. *Id.* No bright-line rule governs when an encounter changes from a consensual one to a seizure, but

13

generally when an officer restrains a citizen's liberty through force or authority, the encounter stops being consensual. *Id.*

### 2. Investigative detentions and custodial arrests both involve restraint but are distinguished by the degree of restraint.

In contrast, both investigative detentions and arrests are restraints on a person's freedom, but an arrest obviously involves the greater degree of restraint. *State v. Sheppard*, 271 S.W.3d 281, 290 (Tex. Crim. App. 2008); *Jones v. State*, 490 S.W.3d 592, 596 (Tex. App.—Houston [1st Dist.] 2016, no pet.). To determine whether an encounter is an investigative detention or an arrest, Texas courts again examine the totality of the circumstances. *Curtis v. State*, 238 S.W.3d 376, 379 (Tex. Crim. App. 2007); *Jones*, 490 S.W.3d at 596. Generally, though, if a detention seems to be something more than would be necessary to simply safeguard the officers and assure the suspect's presence during an investigatory period, this suggests the detention is an arrest. *Sheppard*, 271 S.W.3d at 291; *Jones*, 490 S.W.3d at 596.

"We evaluate whether a person has been detained to the degree associated with arrest on an ad hoc, or case-by-case, basis." *State v. Ortiz*, 382 S.W.3d 367, 372 (Tex. Crim. App. 2012); *Jones*, 490 S.W.3d at 596. The "primary question is whether a reasonable person would perceive the detention to be a restraint on his movement comparable to a formal arrest, given all the objective circumstances." *Jones*, 490 S.W.3d at 596; *see also Stansbury*, 511 U.S. at 322, 114 S. Ct. at 1528–1529. At least four general situations may constitute custody: (1) when the suspect is physically

14

deprived of his freedom of action in any significant way, (2) when a law-enforcement officer tells the suspect that he cannot leave, (3) when law-enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law-enforcement officers do not tell the suspect that he is free to leave. *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996).

For the first three situations, the restriction on a person's freedom of movement must be the same as that associated with an arrest as distinguished from an investigative detention. *Id.*; *see Stansbury*, 511 U.S. at 322, 114 S. Ct. at 1529.

Concerning the fourth situation, the officers' knowledge of probable cause must be manifested to the suspect. *Dowthitt*, 931 S.W.2d at 255. Such manifestation could occur if information substantiating probable cause is related by the officers to the suspect or by the suspect to the officers. *Id.* Moreover, given the emphasis on probable cause as a "factor" in other cases, situation four does not automatically establish custody; rather, custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest. *Id.*

## C. The detectives and Dock engaged in a consensual encounter involving no restraint.

Here, Dock agreed to meet with the detectives, and Dock and his mother voluntarily drove over three hours to the Fort Worth police station. When the

encounter started, Detective Galloway told Dock that they were there just to talk, that Dock was not under arrest, that Dock was free to leave, and that the door was not locked.

Three times during the interrogation itself, Detective Galloway expressly told Dock that he would be free to leave the station when they were finished. First, about 40 minutes in, Dock expressed concerns about whether he would be allowed to leave; Detective Galloway assured Dock that he would be leaving with his mother after they were finished. Shortly after the two-hour mark, Detective Galloway again told Dock, unequivocally, that Dock would be leaving the police station that day. Finally, after the three-hour mark of the interrogation, Detective Galloway again assured Dock that he would be walking out of the police station that day.

And when the interrogation proper was over, Detective Galloway explained to Dock that he (Detective Galloway) would take the information to the district attorney's office and that the district attorney's office would decide what charges to bring. Charges of some sort would be brought, Detective Galloway explained, and once he knew what they were, he would contact Dock.

While technicians worked on performing a "dump" on Dock's phone,[6] which Dock consented to, Detective Galloway brought Dock's mother back to the interrogation room and informed both of them twice in quick succession that as soon

---

[6] "Dumping a cell phone" means making a copy of everything that is on it.

as he was through with Dock's phone, they could leave. About ten minutes later, Detective Galloway told Dock and his mother that they would have to wait about another 15 minutes, after which they could go on their way. Detective Galloway later returned and said that he was going to check on Dock's phone, that Detective Green had stepped out, that basically no one was in the area (by this time it was 5:48 p.m.), and that in case of an emergency, they were to run out; Detective Galloway reminded Dock and his mother that the door was not locked. Twenty-five minutes later, needing to use the restroom, Dock's mother asked Dock if they were locked in, and Dock responded that he did not think so and that he too needed a restroom break. Both of them then left the room through the unlocked door.

That same night, Dock and his mother drove back to Conroe. Detective Galloway procured an arrest warrant for Dock seven days later, on January 24, 2017, and as a courtesy, he called Dock to let him know.

From start to finish, this was a consensual encounter. *See Woodard*, 341 S.W.3d at 410–11. The record supports the trial court's finding that Dock was not in custody. *See Dowthitt*, 931 S.W.2d at 255.

We overrule Dock's second issue.

## II.    Far from circumventing *Miranda*, the detectives followed it.

In Dock's first issue, he argues that the detectives deliberately circumvented *Miranda* and relies primarily on Justice Kennedy's concurring opinion in *Missouri v. Seibert* for the proposition that the police cannot use techniques that are calculated to

17

undermine the *Miranda* warnings. 542 U.S. 600, 622, 124 S. Ct. 2601, 2616 (2004) (Kennedy, J., concurring). But *Siebert*, like *Miranda*, involved a custodial interrogation. *Id.* at 604, 124 S. Ct. at 2605. We have already ruled that the trial court did not err by finding that the interrogation was noncustodial. Without a custodial interrogation, *Miranda* does not come into play. Because *Miranda* was never triggered, there was nothing to circumvent.

Indeed, Detectives Galloway and Green followed an example from *Miranda* itself to illustrate when warnings are not required:

> In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

*Miranda*, 384 U.S. at 478, 86 S. Ct. at 1630 (footnote omitted).

We overrule Dock's first issue.

## III. Law enforcement is not statutorily prohibited from persuading a suspect to give a statement.

In Dock's third issue, he argues that his confession should have been suppressed because the detectives persuaded him to confess and Article 38.21 of the Texas Code of Criminal Procedure expressly prohibits using persuasion:

A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion, under the rules hereafter prescribed.

Tex. Code Crim. Pro. Ann. art. 38.21. Dock contends that the detectives used the "Reid technique" to extract his statements.[7]

We reject Dock's argument for three reasons.

First, Dock's construction of Article 38.21 would lead to an absurd result—outlawing persuasion—that the legislature could not have possibly intended. *See Arteaga v. State*, 521 S.W.3d 329, 334 (Tex. Crim. App. 2017). "Questioning that is

---

[7]A recent law review article summarizes the Reid interrogation as having three parts:

(1) tell the suspect you already know for sure he committed the crime, and cut off any attempts on his part to deny it; (2) offer the suspect [] more than one scenario for how he committed the crime, and suggest that his conduct was likely the least culpable, perhaps even morally justifiable (minimization); (3) overstate the strength of the evidence the police have inculpating the suspect—by inventing non-existent physical evidence or witness statements, for example—and assuring him he'll get convicted regardless of whether he talks.

Dylan J. French, *The Cutting Edge of Confession Evidence: Redefining Coercion and Reforming Police Interrogation Techniques in the American Criminal Justice System*, 97 Tex. L. Rev. 1031, 1039 (2019) (quoting Wyatt Kozinski, *The Reid Interrogation Technique and False Confessions: A Time for Change*, 16 Seattle J. of Soc. Just. 301, 311–12 (2018)).

John E. Reid pioneered the movement away from the physically abusive and physically coercive interrogation tactics (later known as the "third degree") that were frequently used through the mid-20th century. *Id.* at 1036. For over 50 years, the Reid Manual, also known as the Interrogator's Bible, has set the standard in the United States for interrogation practices. *Id.* at 1034–35. But French's article posits a problem: "unarguably effective at eliciting confessions," the Reid technique also "increases the risk of false confessions and deserves attention." *Id.* at 1037, 1040.

aggressive, emotional, highly persuasive, or intelligently calculated to elicit confessions does not raise a voluntariness [issue]." *Miranda v. State*, 08-15-00349-CR, 2018 WL 5862160, at *5 (Tex. App.—El Paso Nov. 9, 2018, pet. granted)[8] (not designated for publication) (referring to Section 6 of Article 38.22 of the Code of Criminal Procedure, which applies to both custodial and noncustodial statements); *Morales v. State*, 371 S.W.3d 576, 589 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd); *Vasquez v. State*, 179 S.W.3d 646, 656–57 (Tex. App.—Austin 2005), *aff'd*, 225 S.W.3d 541 (Tex. Crim. App. 2007).

Second, Article 38.21 contains the qualifier "under the rules hereafter prescribed." Tex. Code Crim. Pro. Ann. art. 38.21. Dock has not pointed to any "rules hereafter prescribed" that categorically prohibit using persuasion.

Third, in *Oursbourn v. State*, the Texas Court of Criminal Appeals analyzed the workings of Article 38.21. 259 S.W.3d 159, 169–73 (Tex. Crim. App. 2008). Nowhere in that discussion is there a categorical prohibition against persuasion.

We overrule Dock's third issue.

## IV.    Dock did not try to suppress the cell-phone search at trial.

In his fourth issue, Dock argues that his consent to search his cell phone was involuntary and that the trial court erred by not suppressing the text-message and

---

[8]Both the appellant and the State filed petitions for review; only the State's was granted.

internet-search evidence procured from that search. But the record shows that Dock did not preserve this issue for our review.

Dock's motion to suppress addressed only his statements; it did not contest anything concerning the search of his phone. Similarly, although during the suppression hearing Detective Galloway mentioned that Dock had given him written consent to "do a cell phone extraction," Dock asked during argument only that the court suppress Dock's statements, a request that was consistent with his motion's scope. Finally, when the State offered the evidence garnered from the cell-phone search, Dock objected—but not on the basis of involuntary consent.

Because Dock has not preserved his fourth issue, we overrule it. *See* Tex. R. App. P. 33.1.

## V. Not having shown error, Dock has no harm to cumulate.

Finally, in Dock's fifth issue, he argues that the cumulative harm from the multiple errors merits reversal. But because Dock has not shown error, there is no harm to cumulate. *See Jenkins v. State*, 493 S.W.3d 583, 620 (Tex. Crim. App. 2016). We overrule Dock's fifth issue.

## Conclusion

Having overruled Dock's five issues, we affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: November 21, 2019